## IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT
## IN AND FOR LEE COUNTY, FLORIDA

ANDREW L. WOODS,

      Plaintiff,

v.

RADIATION THERAPY SERVICES, INC.,
D/B/A 21ST CENTURY ONCOLOGY, a
Florida corporation.

      Defendant.

_____/

### **COMPLAINT**

Plaintiff Andrew L. Woods, by and through undersigned counsel, sues Defendant Radiation Therapy Services, Inc., d/b/a 21st Century Oncology, a Florida corporation, for damages and declaratory relief, and in support states as follows:

### I.  Introduction

1.  This is an action by a former employee, Plaintiff Andrew L. Woods ("Andrew Woods"), against his former employer, Defendant Radiation Therapy Services, Inc., d/b/a 21st Century Oncology ("21C"), for amounts due and payable pursuant to the express terms of the Amended and Restated Executive Employment Agreement, as amended ("Employment Agreement") (copy attached as **Exhibit A**).

2.  After new management terminated Andrew Woods without cause in a corporate restructuring, 21C has refused to pay Andrew Woods: (i) his severance ($2,000,000); (ii) COBRA benefits applicable to him and his dependants; and (iii) earned, but deferred bonuses ($9,000,000), due and payable regardless of whether the termination was with or without cause.

1

3.      As more fully detailed below, the Employment Agreement provided for the payment of up to $10,000,000 in incentive bonuses associated with the federal government's adoption of certain price stabilization initiatives vital to 21C's interests. After years of work by Andrew Woods before the federal government, the federal government adopted such price stabilization initiatives during the term of his employment.

4.      Several financial experts in health care finance (including investment bankers associated with 21C's latest attempt to offer its stock to the public) have calculated that Andrew Woods' efforts significantly increased the revenues and equity value of 21C. For example, one expert calculated that the mitigation of proposed reimbursement amounts resulted in approximately $950 million in additional revenue to 21C from 2010 through 2016. Another expert calculated that the price stabilization initiatives increased 21C's equity value by $200 to $300 million. And, in just the past few months, 21C's investment banker observed that the most significant factor that differentiates 21C's current effort to sell the company or offer stock on a public market from a failed prior effort in 2014, are the federal government's adoption of the price stabilization initiatives 21C tasked Andrew Woods to accomplish through the incentive bonus clauses contained in the Employment Agreement, which were in fact accomplished.

5.      Because of these results, 21C paid Andrew Woods $1,000,000 as an initial installment of the incentive bonuses he earned. However, 21C's new management now refuses to pay: (i) the balance of $9,000,000 deferred incentive bonuses Andrew Woods earned, (ii) his $2,000,000 severance, and (iii) his COBRA benefits.

6.      As a result, Andrew Woods has been forced to file this action seeking damages, pre-judgment interest, post judgment interest, attorneys' fees, and costs.

2

## II.     The Parties, Jurisdiction, and Venue

7.     Plaintiff is a citizen of Florida and has a residence in Ft. Myers, Florida.

8.     Defendant is a Florida corporation with its principal place of business in Ft. Myers, Florida.

9.     This Court has subject matter jurisdiction over this matter because it is an action for damages that exceeds $15,000 – the jurisdictional minimum for this Court. This Court also has subject matter jurisdiction pursuant to Section 86.011, Florida Statutes, over the declaratory relief sought in this Complaint.

10.     This Court has personal jurisdiction over the Defendant because it is a Florida corporation with its principal place of business located in Ft. Myers, Florida.

11.     Pursuant to Section 16 of the Employment Agreement, both parties agreed to submit to the exclusive jurisdiction of "any court of competent jurisdiction in the State of Florida" and further agreed to waive any objections "to the laying of the venue of any suit, action, or proceeding arising out of or relating to this Agreement brought in any court of competent jurisdiction in the State of Florida."

12.     Pursuant to Section 47.011, Florida Statutes, venue of this action in this judicial circuit is proper and appropriate because the Defendant resides in this judicial circuit and the causes of action set forth in this Complaint accrued within this judicial circuit.

### III.     Factual Background

**A. Andrew Woods' History With Cancer Care**

13.     Andrew Woods is a native Floridian.

14.     After completing law school, Andrew Woods began representing clients involved in providing cancer care. While practicing as a lawyer, Andrew Woods expanded his practice to

3

include the representation of clients before governments and government agencies. For over twenty years, Andrew Woods has focused on building bipartisan relationships in the United States Congress and elsewhere for the benefit of his clients involved in cancer care.

15.     In approximately February 2010, Andrew Woods formed Liberty Partners Group, LLC, a District of Columbia limited liability company ("Liberty Partners"), which provides government relations counsel before the United States House of Representatives, the United States Senate, the White House, and federal agencies.   On behalf of the clients of Liberty Partners, Andrew Woods has advocated before the federal government for appropriate reimbursement models and other issues of interest to providers of cancer care.

16.     Andrew Woods is known as one of the most knowledgeable and respected advocates for cancer care providers.

17.     Over the past twenty-six years, Andrew Woods has had an ongoing relationship with 21C, providing services vital to its interests. Over the years, 21C's management and Board of Directors have utilized Andrew Woods, for example, as a federal lobbyist and as a senior company executive, often giving him the most complex and challenging assignments.

**B. Upon 21C's Request, and With Its Knowledge and Consent, Andrew Woods Has Addressed National Policy Issues on Behalf of Multiple Clients.**

18.     As a provider of cancer care and, in particular, radiation therapy, 21C's revenue is intrinsically tied to federal policy decisions made by the United States Congress, the United States Executive branch, and the Centers for Medicare and Medicaid Services ("CMS").

19.     To influence national healthcare policy, including change related to reimbursement of cancer care providers, 21C recognized that such efforts would have a greater chance of success if made by industry trade groups, or many members of the industry, as

4

opposed to a single, small to mid-size healthcare provider based in Southwest Florida, like 21C. Thus, over many years (including the years applicable to the Employment Agreement), upon 21C's request and with 21C's knowledge and consent, Andrew Woods has simultaneously represented industry groups, 21C, and other members of the industry when lobbying for national health care policies that were aligned with 21C's interests (hereinafter a "National Policy Representation").

20.     For example, in the early 2000s, a technology known as intensity-modulated radiation therapy ("IMRT") emerged as an industry leading treatment.   IMRT uses computer controlled linear accelerators to accurately deliver radiation to a tumor or areas of a tumor, which helps preserve the healthy cells in the vicinity of the cancer from being damaged by the treatment.  Initially, CMS had a reimbursement code for IMRT provided in a hospital setting, but no reimbursement code for IMRT provided in a freestanding clinic.  As such, free standing clinics could not get reimbursed from CMS for the provision of IMRT to Medicare beneficiaries.

21.     In accordance with the National Policy Representations strategy outlined above, 21C recognized that Andrew Woods lobbying on behalf of 21C alone, as a single entity based in Southwest Florida, would have very little weight with CMS.  Thus, upon 21C's request and with 21C's knowledge and consent, Andrew Woods represented several industry members, including 21C, before the federal government in an effort to obtain a Medicare reimbursement code for IMRT provided at free standing facilities.

22.     Andrew Woods faced fierce opposition from hospital based radiation oncology groups and others who opposed the provision of IMRT at free standing facilities.  Eventually, Andrew Woods' tenacity and perseverance prevailed, and CMS created a reimbursement code and rate for the provision of IMRT at free standing facilities.  It was the first such code issued by

5

CMS for reimbursement of IMRT at free standing facilities. The result benefited 21C (and other health care providers) and also benefitted patients, who could now choose to receive IMRT at local free standing facilities instead of in a hospital setting. Indeed, it was the valuable revenue stream caused by CMS' issuance of this reimbursement code that attracted a private equity firm, Vestar Capital Partners, to invest and take 21C private (from the public market) based on a valuation model reflecting a 21C value of eleven times EBITDA.

23.    Over the years (including all years applicable to the Employment Agreement), 21C also routinely asked Andrew Woods to make introductions to certain of Liberty Partners' other clients, or to act as a bridge between 21C and such other clients. By way of example, since retiring from Congress in January 2001, Senator Connie Mack joined Andrew Woods to create a powerful federal lobbying team. Senator Mack and Andrew Woods worked as team members at two law firms before forming Liberty Partners.

24.    From approximately 2002 to the present, Senator Mack has been the Chairman of the Board, or the Chairman Emeritus, of the H. Lee Moffitt Cancer Center & Research Institute ("Moffitt"). For many of those years, including since before signing the Employment Agreement in 2010 to the present, Andrew Woods has been publicly listed as a lobbyist for Moffitt. At all times material hereto, 21C has been fully aware that Moffitt has been a client of Liberty Partners. Indeed, on several occasions during the term of the Employment Agreement, 21C has asked Andrew Woods to use his and/or Liberty Partners' good relationship with Moffitt to present it with issues of importance to 21C.

25.    Likewise, at all times material hereto, 21C has been fully aware that US Oncology has been a client of Andrew Woods and/or Liberty Partners. Since before signing the

6

Employment Agreement to the present, Andrew Woods has been publicly listed as a lobbyist for US Oncology.

### C. Because it Was in 21C's Best Interests for Andrew Woods to Continue to Lobby on Behalf of Other Entities Providing Radiation Therapy, the Employment Agreement <u>Explicitly</u> Allows Andrew Woods to Do So.

26.    In approximately 2010, Defendant 21C hired Andrew Woods as an employee. The parties executed an employment agreement, which has been amended and restated. The operative agreement is the Employment Agreement dated as of May 13, 2013, as amended, attached hereto as Exhibit A.

27.    Recognizing the importance of Andrew Woods' work with regard to the National Policy Representations, 21C and Andrew Woods discussed and agreed that Andrew Woods should continue to provide services to other clients even while employed by 21C.

28.    Therefore, the Employment Agreement <u>explicitly</u> allowed Andrew Woods to continue to provide services to others clients. The Employment Agreement provides, in pertinent part:

> 1. EMPLOYMENT. . . . Nothing herein shall preclude Executive from (1) serving or continuing to serve on the board or advisory committees of medical, charitable, or other similar organizations or, with the consent of the Board, on the board of a for-profit corporation, or (ii) continue to own a majority interest in and provide services to Liberty Partners Group, LLC and their clients ("Liberty Partners"), in each case so long as such activities do not materially interfere with Executive's performance under this Agreement and would not otherwise violate any provision of <u>Section 8</u> or <u>9</u> of this Agreement.
>
> \*                    \*                    \*
>
> 9. PROHIBITION OF CERTAIN ACTIVITIES.      . . . Notwithstanding anything to the contrary herein, the following shall not be deemed Prohibited Activities under clause (i) above: . . . (b) Continuing to provide services to a current client or new client of Liberty Partners substantially similar to the

7

services such client or similar clients receive as of the date of this Agreement; provided that (A) in no circumstance shall such services involve the use or disclosure of any confidential information in violation of Section 9, and (B) such services are not reasonably expected to have an adverse impact on the Company or any of its Affiliates, as determined by the Board. Executive shall cooperate with the Board in determining whether Executive's services to Liberty Partners would be in violation of this Section 9.

29.     On numerous occasions, at 21C's request and with its knowledge and approval, Andrew Woods engaged in National Policy Representations while an employee of 21C.

30.     At all times material hereto, Andrew Woods fully complied with his obligations under the Employment Agreement, including, without limitation, those provided in Sections 1, 8, and 9 of the Employment Agreement.

31.     When drafting the Employment Agreement, 21C set forth three opportunities for Andrew Woods to earn incentive bonuses up to $10,000,000, and tied the incentive bonuses to the achievement of National Policy Representations relating to price stabilization initiatives.

32.     Section 3(b) of the Employment Agreement provides that Andrew Woods shall be entitled to receive the following incentive bonuses:

    a.   a $5,000,000 incentive bonus ". . . for achievement during the Term of a freeze on reductions in Medicare reimbursement to freestanding radiation therapy centers except for those reductions negotiated on behalf of the Company."

    b.   a $2,500,000 incentive bonus ". . . for achievement during the Term of adoption of a new, multi-bundled payment system for freestanding radiation therapy centers, to which the Company elects not to participate."

    c.   a $2,500,000 incentive bonus ". . . upon the Company's initial election to participate in any way in the [new, multi-bundled payment system] . . . ."

8

33.     21C explicitly tied the $5,000,000 bonus to a National Policy Representation that froze reductions in Medicare reimbursement for the industry, and explicitly disallowed the bonus for any freeze on reductions negotiated solely on behalf of the Company.

34.     21C explicitly tied the first $2,500,000 bonus to a National Policy Representation that provided a new payment system applicable to the industry regardless of 21C's participation in the new system. 21C informed Andrew Woods that the mere adoption of a new, multi-bundled payment system for freestanding radiation therapy centers would enhance 21C's financial stability because the new system would set a known "floor" for reimbursement rates, which was vital for financial valuations.

35.     21C explicitly tied the $2,500,000 bonus to its participation in the system that resulted from a National Policy Representation.

### D. After Executing the Employment Agreement, Andrew Woods Continued to Provide Vital Services to Defendant 21C and Other Entities Providing Radiation Therapy

36.     After executing the Employment Agreement, Andrew Woods (through Liberty Partners) continued to provide National Policy Representation services to its clients as contemplated and provided for by the Employment Agreement, and upon 21C's request, and with the full knowledge, concurrence, and support, of 21C.

37.     At numerous meetings of 21C's Board, and in numerous meetings with 21C's top executives, Andrew Woods regularly informed 21C of his National Policy Representations. In all instances, 21C's Board and/or its executives requested, acknowledged, and agreed that Andrew Woods should continue with such National Policy Representations.

38.     The strategy of using National Policy Representations became even more important to 21C as it became embroiled in several federal investigations and multiple lawsuits,

9

further reducing 21C's ability to unilaterally lobby the federal government without the assistance of Andrew Woods' National Policy Representations involving multiple players in the industry.

39.     For example, after initially providing a reimbursement code and rate for IMRT provided at freestanding facilities, CMS began reducing the reimbursement rate for such services.  CMS's annual reduction of the reimbursement rate for IMRT and other radiation oncology services provided at freestanding facilities, such as the ones owned and operated by 21C, threatened 21C and other providers of radiation therapy with financial ruin.

40.     Andrew Woods and Liberty Partners, upon 21C's request and with 21C's knowledge and consent, undertook a National Policy Representation to freeze reimbursement rates for IMRT and other radiation oncology services, so that 21C (and others in the industry) would not face the uncertainty and negative financial consequences of continued reductions in reimbursement from the Medicare program.

41.     To that end, 21C, and the major investor in 21C (Vestar Capital), requested that Andrew Woods form and operate a non-profit organization known as Radiation Therapy Alliance ("RTA") to represent RTA members on various reimbursement (and other) issues.  Jim Elrod, a board member of 21C and Vestar, was instrumental in convincing Andrew Woods that his highest and best use for 21C would be to establish and operate the RTA.  Over the years, the RTA grew to represent over 235 community based cancer care facilities operating in thirty five states.

42.     At 21C's request and with its knowledge and consent, Andrew Woods spearheaded the National Policy Representation to obtain a freeze on reductions in Medicare reimbursement for freestanding radiation therapy centers.  During this time, Andrew Woods also successfully worked to mitigate CMS annual reimbursement cuts.  Avalere Health, one of the

10

leading healthcare analytics firms in the nation, estimated that Andrew Woods' successful efforts to mitigate CMS' proposed annual reimbursement cuts from 2010 to 2016 was worth $950 million in additional revenue to 21C.

43.     After several years of hard work, Andrew Woods was successful, and on December 28, 2015, the United States Congress (through a unanimous vote of 100-0 in the Senate and 435-0 in the House) passed a law that froze reductions in Medicare reimbursement for freestanding radiation therapy centers.

44.     The freeze provided 21C with a major financial boost, which allowed it to continue to provide cancer treatment to its patients. Another financial analyst calculated that the freeze increased 21C's equity value by $200 to $300 million. In the past few months, 21C's investment banker, hired to sell the company or take it public, observed that the existence of the freeze is a significant positive factor that did not exist during 21C's prior, failed effort to go public in 2014.

45.     While successfully mitigating CMS's annual proposed cuts and moving towards the Congressionally mandated freeze, at 21C's request and with its knowledge and consent, Andrew Woods and Liberty Partners worked on other National Policy Representations, including, without limitation, lobbying the federal government for a new, multi-bundled payment system for freestanding radiation therapy centers.

46.     After years of work, in February 2015, the United States Department of Health and Human Services ("HHS") announced a new, multi-bundled payment system for cancer care services, that included reimbursement for freestanding radiation therapy centers.

47.     Several freestanding radiation oncology therapy companies, including 21C, have now elected to participate in the new, multi-bundled payment system.

11

48.     During the term of the Employment Agreement, Andrew Woods met with 21C's

CEO and members of its Board on a regular basis regarding his National Policy Representations.

These meetings included Dr. Dosoretz, Howard Sheridan, M.D., James Rubenstein, M.D., Erin

Russell, Bryan Carey, Jim Elrod, Christian Hensley, and others.  In each of these meetings, 21C,

its executives, and Board members requested, acknowledged, and consented to Andrew Woods'

continued representation of other clients of Liberty Partners, including, without limitation,

Moffitt and McKesson/US Oncology.  None of 21C's executives or Board members has ever

claimed that Andrew Woods' representation of any other entities was, or would be, considered a

breach of his Employment Agreement.

### E. Defendant 21C Has Acknowledged its Obligation to Pay Andrew Woods his Incentive Bonuses

49.     In or about February 2015, during the Term of the Employment Agreement, CMS

adopted a new, multi-bundled payment system for freestanding radiation therapy centers.

50.     Within approximately five days, Andrew Woods notified Dr. Daniel Dosoretz,

21C's CEO, of 21C's contractual obligation to begin paying the bonus associated with CMS's

adoption of the new, multi-bundled payment system.

51.     Dr. Dosoretz acknowledged and agreed that 21C was obligated to pay the

$2,500,000 incentive bonus associated with CMS's adoption of the new, multi-bundled payment

system, but asked Andrew Woods to temporarily defer payment of the bonus because of cash

flow issues 21C was experiencing.

52.     In or about July, 2015, during the Term of the Employment Agreement, 21C

elected to participate in CMS' new, multi-bundled payment system for freestanding radiation

therapy centers.

12

53.     Within approximately five days, Andrew Woods notified Dr. Dosoretz of 21C's contractual obligation to begin paying the bonus associated with 21C's election to participate in CMS' new, multi-bundled payment system.  Dr. Dosoretz acknowledged and agreed that 21C was obligated to pay the $2,500,000 bonus associated with 21C's election to participate in CMS' new, multi-bundled payment system, but again asked Andrew Woods to temporarily defer payment of the bonus.

54.     In December 2015, during the Term of the Employment Agreement, CMS instituted the freeze on reductions in Medicare reimbursement to freestanding radiation therapy centers.

55.     Within approximately five days, Andrew Woods notified 21C's Dr. Dosoretz of 21C's contractual obligation to pay the bonus associated with such freeze.   Dr. Dosoretz acknowledged and agreed that 21C was obligated to pay the $5,000,000 incentive bonus associated with the freeze.  In January 2016, 21C paid $1,000,000 of the $5,000,000 incentive bonus associated with the freeze and deferred payment of $4,000,000 in accordance with a clause in Section 3(b) that allowed the incentive bonus to be paid over a five year period.  Moreover, 21C recorded the obligation to pay Andrew Woods the five million dollar incentive bonus in its financial records.

56.     21C's payment of the first installment of $1,000,000 of the $5,000,000 incentive bonus related to the freeze in reduction in Medicare reimbursement to freestanding radiation therapy centers is an unequivocal acknowledgement by 21C that Andrew Woods is entitled to such bonus.

13

**F. 21C's New Management is Bound by the Agreements and Actions of Predecessor Management**

57.    In September of 2016, 21C replaced its CEO, several top executives, and members of its Board.

58.    Even though it has changed its CEO, 21C is still bound by the contracts signed by prior management and the agreements made by prior management.

59.    Specifically, a change in management has not changed 21C's admission that Andrew Woods is due the deferred $4,000,000 incentive bonus associated with the freeze on reductions in Medicare reimbursement, nor does it change Andrew Woods' entitlement to the deferred $5,000,000 incentive bonus associated with the new, multi-bundled payment system he earned.

60.    On September 23, 2016, 21C's new management terminated Andrew Woods' Employment Agreement without cause.

61.    Pursuant to Section 5(a) of his Employment Agreement, upon *any* termination (regardless of whether with or without cause) of employment by 21C, Andrew Woods is entitled to his "Accrued Compensation."   Section 5(a) defines "Accrued Compensation to include Base Salary and unreimbursed expenses unpaid through the date of termination and "any nonforfeitable benefits already earned and payable to him under the terms of any deferred compensation, incentive, or other benefit plan maintained by the Company, payable in accordance with the terms of the applicable plan."  The plain language of the Employment Agreement created a deferred incentive benefit plan of which $9,000,000 was earned and deferred as of the termination date.  Thus, pursuant to Sections 5(a) and 3(b), 21C was obligated on the September 23, 2016 termination date to pay Andrew Woods his Accrued Compensation, which included his deferred incentive bonuses of $9,000,000.

14

62.     Moreover, pursuant to Section 5(b) of his Employment Agreement, the termination of employment without cause entitled Andrew Woods to additional payments of: (i) two years severance ($2,000,000) payable in twenty-four monthly installments; and (ii) certain COBRA payments for a period of twelve months.  Additionally, upon a termination of employment without cause, the deferred incentive bonuses of $9,000,000 are immediately due and payable under Section 3(b) ("Any deferred payments of incentive bonuses shall be immediately accelerated and paid in full in the event of (A) the Executive's termination without Cause . . . .").

63.     21C informed Andrew Woods that he was being terminated without cause because 21C could no longer afford to pay him his salary.  21C acknowledged its obligation to pay Andrew Woods his severance and COBRA benefits by sending him a release to be executed.  The severance, COBRA benefits, and release are all associated with a termination without cause.  Had 21C terminated Andrew Woods for cause, it would not have sent him the release, because the Employment Agreement does not contemplate a release being executed upon a termination for cause.  At no time before Andrew Woods was terminated, or thereafter (until a letter received from 21C's lawyer), had any person at 21C ever told Andrew Woods that he breached, or in any way violated, the Employment Agreement.

64.     On September 27, 2016, Andrew Woods sent the general counsel of 21C an email attaching a general release, and stating that he was ready, willing, and able to sign the release in accordance with the terms of his Employment Agreement.  *See* **Exhibit B** attached hereto.  The general release sent by Andrew Woods was consistent with the terms of the general release provided by 21C and the Employment Agreement.  Because he had been informed that 21C did not immediately have the available cash to pay him the deferred bonuses he had earned under the

15

Employment Agreement, Andrew Woods made a minor revision to 21C's release to make clear that by executing the release, he was not releasing his right to receive the deferred incentive bonuses that 21C had already acknowledged were due to him.

65.     In response to a request from the new CEO of 21C that he itemize in writing the bonus payments he was due, on September 27, 2016, Andrew Woods sent an email attaching a letter itemizing the bonuses due to him pursuant to his Employment Agreement. *See* **Exhibit C** attached hereto. In the September 27, 2016 letter, Andrew Woods explained that his incentive bonuses (with a balance due of nine million dollars) were immediately due and payable pursuant to his Employment Agreement. Because 21C had previously informed him that it did not have the cash available to immediately pay the bonuses, Andrew Woods did not demand that the deferred incentive bonuses be paid immediately, but instead asked that the deferred incentive bonuses be paid "as soon as practicable."

### G. 21C Has Breached the Employment Agreement.

66.     Almost three weeks after sending his September 27, 2016 letter, on October 14, 2016, Andrew Woods received a response from a law firm representing 21C. *See* **Exhibit D** attached hereto.

67.     In an obvious attempt to deny Andrew Woods the contractual payments he earned, 21C through its lawyers fabricated an excuse to avoid any further payment to him. After years of obtaining incredible results for 21C, the lawyers for 21C, without any basis, attempted to "convert" his termination without cause to a termination "for cause," based on demonstrably false grounds.

68.     The October 14, 2016 letter alleges, without providing any supporting facts, that Andrew Woods breached Section 9 of his Employment Agreement by lobbying on behalf of

16

Moffitt. As is explained in more detail above, Andrew Woods' representation of Moffitt was not a breach of any provision of the Employment Agreement. None of the services that Andrew Woods provided for Moffitt involved the use of 21C's confidential information as that term is defined in Section 8 of the Employment Agreement, and none of such services could reasonably be expected to have an adverse impact on 21C. In fact, they were expected to, and did, have a very positive effect on 21C. Moreover, 21C knew of, and approved of, Andrew Woods' and Liberty Partners' representation of Moffitt in conjunction with his valuable services to 21C.

69.    Notably, the October 14, 2016 letter does not dispute that Andrew Woods earned the $5,000,000 incentive bonus associated with obtaining the freeze on reductions in Medicare reimbursement to freestanding radiation therapy centers.

70.    The October 14, 2016 letter unequivocally states that 21C will not be making any severance or other payments to Andrew Woods. Likewise, in a November 4, 2016 letter, 21C's counsel confirmed that 21C would not be making any further payments to Andrew Woods, and continued to accuse Andrew Woods of violating the terms of his Employment Agreement. Such allegations are false and baseless.

71.    21C's actions constitute a repudiation of, breach of, and/or anticipatory breach of the Employment Agreement, and excuse Andrew Woods from having to perform his obligations under the Employment Agreement, including the execution of a release, even though Andrew Woods is ready, willing, and able to sign a release upon 21C's acknowledgement of the payments that are due to him.

72.    All conditions precedent to the filing of each count in this action has been met, excused, or waived.

17

73.     Because of 21C's breach of his Employment Agreement, Andrew Woods has retained counsel, including undersigned counsel, to protect his rights.

## IV.     Causes of Action

### Count I – Breach of the Employment Agreement by 21C

74.     Andrew Woods hereby incorporates paragraph 1 through 73 as if fully set forth herein.

75.     Andrew Woods and 21C are parties to the Employment Agreement.

76.     On September 23, 2016, 21C terminated Andrew Woods' employment without cause.

77.     Pursuant to the terms of the Employment Agreement, Andrew Woods is entitled to payment by 21C of the following:

 a.    Two Million Dollars ($2,000,000) in severance payments now due in a lump sum because of 21C's anticipatory breach;

 b.    Twelve months of continued coverage pursuant to COBRA for Andrew Woods and his dependants now due in a lump sum due to 21C's anticipatory breach;

 c.    Four Million Dollars ($4,000,000) representing the balance of the deferred incentive bonus earned for achievement of a freeze on reductions in Medicare reimbursement to freestanding radiation therapy centers;

 d.    Two Million, Five Hundred Thousand Dollars ($2,500,000) representing the balance of the deferred incentive bonus earned for achievement of the

18

adoption of a new, multi-bundled payment system for freestanding radiation therapy centers;

e. Two Million, Five Hundred Thousand Dollars ($2,500,000) representing the balance of the deferred incentive bonus earned for 21C's election to participate in the new, multi-bundled payment system for freestanding radiation therapy centers.

78.  Andrew Woods is entitled to the incentive bonuses he earned identified in paragraphs c., d., and e., of the preceding paragraph, regardless of whether the termination of his employment was with or without cause.

79.  The payments due to Andrew Woods are considered wages under Florida law.  As such, Andrew Woods is also entitled to his attorneys' fees and costs pursuant to Florida Statute 448.08 (2016).

80.  In addition, Andrew Woods is entitled to grants of equity interests pursuant to Section 4(d) of the Employment Agreement and the terms of the Letter Agreement attached hereto as **Exhibit E**.

81.  21C has repudiated, breached, and/or anticipatorily breached the terms of the Employment Agreement by failing to pay and refusing to pay the amounts referenced in Paragraph 77 to Andrew Woods.

82.  21C has repudiated, breached, and/or anticipatorily breached the terms of the Employment Agreement and the Letter Agreement by failing to grant the equity interests referenced in paragraph 80 to Andrew Woods.

83.  Andrew Woods has been damaged and will continue to be damaged by 21C's repudiation, breach and/or anticipatory breach of the Employment Agreement.

19

WHEREFORE Plaintiff Andrew Woods requests that a judgment be entered in his favor and against Defendant 21C awarding Andrew Woods damages; pre-judgment interest; post-judgment interest; attorneys' fees and costs pursuant to Section 448.08, Florida Statutes; ordering 21C to specifically perform its obligation to provide him with equity interests; alternatively (to the extent the damages award does not award the severance and COBRA benefits in a lump sum) ordering 21C to specifically perform its obligation to pay severance and COBRA benefits in accordance with the schedule set forth in the Employment Agreement; and granting him such other and further relief the Court deems necessary and appropriate.

### Count II – Action for Declaratory Judgment Regarding the Employment Agreement
### (Andrew Woods Excused from Signing a Release)

84.     Andrew Woods hereby incorporates paragraph 1 through 73 as if fully set forth herein.

85.     Andrew Woods and 21C are parties to the Employment Agreement.

86.     On September 23, 2016, 21C terminated the Employment Agreement without cause.

87.     Section 5(f) of the Employment Agreement provides that in order to receive the two million dollars in severance payments and the 12 months of COBRA payments, Andrew Woods must execute and not revoke a release of 21C substantially in the form of the release attached to the Employment Agreement as Exhibit A.   Section 5(f) further provides that if the release is not provided within sixty days of termination, Andrew Woods allegedly forfeits all rights to receive the two million dollars in severance payments and the 12 months of COBRA payments.

20

88.     Andrew Woods notified 21C that he is ready, willing, and able to sign an appropriate release in order to receive the two million dollars in severance payments and the 12 months of COBRA payments.

89.     In response, in its lawyers' October 14, 2016 letter, 21C unequivocally stated that it was not going to pay Andrew Woods anything further, including, without limitation, the two million dollars in severance payments and the 12 months of COBRA payments.

90.     Andrew Woods takes the position that 21C's repudiation, breach, and/or anticipatory breach of his Employment Agreement, and refusal to pay him the amounts that are due and will be due, excuse Andrew Woods from having to perform his obligations under the Employment Agreement, including the execution of a release.

91.     21C has not responded to Andrew Woods' minor revisions to 21C's proposed release, or otherwise addressed the issue of the release.

92.     Andrew Woods seeks a declaration that he is excused from signing any release in favor of 21C until and unless 21C acknowledges its obligation to pay Andrew Woods his two million dollars in severance payments and the 12 months of COBRA payments, and makes such payments in accordance with the terms of the Employment Agreement.

93.     Andrew Woods and 21C have a genuine disagreement with regard to any obligation that Andrew Woods may have to sign a release in light of 21C's repudiation, breach, and/or anticipatory breach of the Employment Agreement and its obligation to pay Andrew Woods two million dollars in severance payments and the 12 months of COBRA payments provided for in the Employment Agreement.

94.     Because of 21C's conduct, Andrew Woods has been denied his rights and benefits under the Employment Agreement and requires a judicial determination concerning any alleged

obligation to provide a release in order to receive his two million dollars in severance payments and the 12 months of COBRA payments.

95.     Andrew Woods and 21C have a present, adverse, antagonistic interest in the subject matter of this matter.

96.     There is a bona fide, actual, present, and practical need for a declaration from this Court regarding any alleged obligation of Andrew Woods to provide a release within sixty days of his termination in order to receive his two million dollars in severance payments and the 12 months of COBRA payments.

97.     Based on the plain language of the Employment Agreement and the letters attached to this Complaint, and other ascertainable facts, the Court can make a decision.

WHEREFORE Plaintiff Andrew Woods requests that a declaratory judgment be entered declaring that Andrew Woods is excused from signing any release in favor of 21C until and unless 21C acknowledges its obligation to pay Andrew Woods his two million dollars in severance payments and the 12 months of COBRA payments, and makes such payments in accordance with the terms of the Employment Agreement, attorneys' fees pursuant to Fla. Stat. §448.08, and such other and further relief the Court deems necessary and appropriate.


**Count III – Action for Declaratory Judgment Regarding the Employment Agreement ("Prohibited Activities")**

98.     Andrew Woods hereby incorporates paragraph 1 through 73 as if fully set forth herein.

99.     Andrew Woods and 21C are parties to the Employment Agreement.

22

100.    On September 23, 2016, 21C terminated the Employment Agreement without cause.   The Employment Agreement contains provisions that prohibit Andrew Woods from engaging in certain activities *if* he is receiving payment of his severance and COBRA benefits.

101.    The Employment Agreement has clauses that purport to prohibit Andrew Woods from engaging in certain defined "Prohibited Activities," but also has a clause providing that such prohibitions "will be of no force and effect for the period (the "Toll Period") during which the Company fails to make the payments, if any, required under Section 5(b) and such payments are in fact due and payable pursuant to Section 5(b), provided that the Toll Period shall not take effect unless the Executive provides the Board with written notice that such payments are due and payable and the Company does not make such payments within thirty (30) days after the date of such notice."

102.    Section 5(b) contains the severance and COBRA benefits due to Andrew Woods. Such severance and COBRA benefits are in fact due and payable.

103.    Andrew Woods has not engaged in any Prohibited Activities.

104.    Moreover, Andrew Woods has provided notice to the Board, through counsel for 21C, that 21C has not paid the severance and COBRA benefits that are in fact due and payable. Thirty days have passed since Andrew Woods provided such notice, and 21C has not made the required payments.   To avoid any doubt as to notice to the Board, Andrew Woods is providing a copy of this Complaint to each member of the Board.

105.    In addition, 21C has stated that it will not make severance or COBRA payments to Andrew Woods, and has thereby repudiated, breached, and/or anticipatorily breached the Employment Agreement, excusing Andrew Woods from having to perform his obligations under

23

the Employment Agreement, including the provisions of Paragraphs 9 of the Employment Agreement.

106.   Andrew Woods takes the position 21C's failure to pay him the amounts due under Section 5(b) has commenced the Toll Period.

107.   21C has taken the position that Section 9 is in effect, and therefore not tolled, and accused Andrew Woods of engaging in Prohibited Activities after his termination of employment.

108.   Andrew Woods seeks a declaration that the Toll Period has commenced and therefore Section 9 of his Employment Agreement shall have no force and effect during the Toll Period, and that 21C's repudiation, breach, and/or anticipatory breach of the Employment Agreement excuses his further obligation as to Section 9 of the Employment Agreement.

109.   Andrew Woods and 21C have a genuine disagreement with regard to whether Andrew Woods is bound by the provisions of Section 9 of the Employment Agreement.

110.   Because of 21C's conduct, Andrew Woods requires a judicial determination concerning whether Andrew Woods is bound by the provisions of Section 9 of the Employment Agreement.

111.   Andrew Woods and 21C have a present, adverse, antagonistic interest in the subject matter of this matter.

112.   There is a bona fide, actual, present, and practical need for a declaration from this Court regarding whether Andrew Woods is bound by the provisions of Section 9 of the Employment Agreement, as it affects his ability to conduct his business, and maintain the clients he has had for many years before the Employment Agreement and which 21C knew about and

24

approved during the term of Andrew Woods' employment with 21C pursuant to the Employment Agreement.

113.    Based on the plain language of the Employment Agreement and the letters attached to this Complaint, and other ascertainable facts, the Court can make a decision.

WHEREFORE Plaintiff Andrew Woods requests that a declaratory judgment be entered declaring that the Toll Period has been commenced, that Andrew Woods is not bound by the terms of Section 9 of his Employment Agreement, and that they shall have no force and effect, attorneys' fees pursuant to Fla. Stat. §448.08, and granting such other and further relief the Court deems necessary and appropriate.

Date:  November 18, 2016

Respectfully submitted,

ZUMPANO PATRICIOS & WINKER, P.A.
312 Minorca Avenue
Coral Gables, 33134
Tel:    305-444-5565
Fax:    305-444-8588

By:    /s/ Joseph I. Zumpano
       Joseph I. Zumpano
       Florida Bar No. 56091
       jzumpano@zpwlaw.com
       Leon N. Patricios
       Florida Bar No. 12777
       lpatricios@zpwlaw.com
       Bryan R. Cleveland
       Florida Bar No. 0801984
       Bcleveland@zpwlaw.com

25

# EXHIBIT A

Execution Copy

## AMENDED AND RESTATED EXECUTIVE EMPLOYMENT AGREEMENT

THIS AMENDED AND RESTATED EXECUTIVE EMPLOYMENT AGREEMENT ("Agreement"), dated as of May 13, 2013, by and between RADIATION THERAPY SERVICES, INC. D/B/A 21ST CENTURY ONCOLOGY, a Florida corporation (the "Company"), and ANDREW WOODS ("Executive").

WHEREAS, the Company is engaged in the business of providing radiation therapy services to cancer patients;

WHEREAS, the Company and the Executive are parties to an Executive Employment Agreement dated as of May 11, 2011 (the "2011 Agreement"); and

WHEREAS, the Company and the Executive wish to amend and restate the terms of the 2011 Agreement.

NOW THEREFORE, in consideration of the mutual covenants herein contained, the parties, intending to be legally bound, hereby agree as follows:

1.     EMPLOYMENT. The Company hereby agrees to employ the Executive upon the terms and conditions herein contained, and the Executive hereby agrees to accept such employment for the term described below. The Executive agrees to serve as the Company's Executive Vice President for Governmental Affairs and Senior Vice President for Business Development during the Term (as defined below) and have the duties and responsibilities as may be reasonably assigned to him by the Chief Executive Officer or the board of directors of the Company (the "Board"). In such capacity, the Executive shall report to the Chief Executive Officer and shall have the authorities, functions, powers, duties and responsibilities that are customarily associated with such positions and as the Chief Executive Officer or the Board may reasonably assign to him from time to time consistent with such positions.

Throughout the Term, the Executive shall devote his best efforts and substantially all of his business time and services to the business and affairs of the Company. Nothing herein shall preclude Executive from (i) serving or continuing to serve on the boards or advisory committees of medical, charitable, or other similar organizations or, with the consent of the Board, on the board of a for-profit corporation, or (ii) continue to own a majority interest in and provide services to Liberty Partners Group, LLC and their clients ("Liberty Partners"), in each case so long as such activities do not materially interfere with Executive's performance under this Agreement and would not otherwise violate any provision of Sections 8 or 9 of this Agreement. As periodically requested by the Board, Executive shall use commercially reasonable efforts to assist the Board in determining whether Executive's membership on the board of directors or any other involvement with any entity, including the provision of services to Liberty Partners, that could reasonably be expected to result in health care compliance issues or liability for the Company or any of its subsidiaries, Affiliates (as defined below) and/or joint ventures and to take such actions as are reasonably requested by the Board to remedy and/or mitigate any such issues or liability identified by the Board.

2.     TERM OF AGREEMENT. The initial five (5) year term ("Initial Term") of employment under this Agreement shall commence as of May 1, 2013 (the "Effective Date"). After the

Woods - AR Employment Agmt (FINAL).docx

expiration of such Initial Term, the term of the Executive's employment hereunder shall automatically be extended without further action by the parties for successive two (2) year renewal terms ("Renewal Terms" and, collectively with the Initial Term, the "Term"), provided that if either party gives the other party at least one hundred twenty (120) days advance written notice of its intention to renew this Agreement for Renewal Term, the Agreement shall terminate upon the expiration of the then current Term.

Notwithstanding the foregoing, the Company shall be entitled to terminate this Agreement immediately before the end of the Initial Term or any Renewal Term, subject to a continuing obligation to make the payments, if any, required under Section 5 below, if the Executive (i) becomes Disabled (as defined in Section 5(c) below), (ii) is terminated by the Company for Cause or without Cause or (iii) voluntarily terminates his employment for Good Reason or for any other reason or no reason before the then current Term of this Agreement expires.

3.    EXECUTIVE COMPENSATION.

(a)    Annual Base Salary.  The Executive shall receive an annual base salary during the Term at a rate of not less than One Million Dollars ($1,000,000) (as increased from time to time pursuant to this Agreement, the "Base Salary"), payable in installments consistent with the Company's normal payroll schedule.  For the avoidance of doubt, the Executive's Base Salary shall be prorated for the 2013 fiscal year.  The Board or its Compensation Committee (the "Compensation Committee") shall review this Base Salary at annual intervals, and may, but shall not be obligated to, increase the Base Salary from time to time as the Board or the Compensation Committee deems to be appropriate.

(b)    Performance Incentive and Other Bonuses.  The Executive shall be entitled to receive the following incentive bonuses: (i) Five Million Dollars ($5,000,000) from the Company for achievement during the Term of a freeze on reductions in Medicare reimbursement to freestanding radiation therapy centers except for those reductions negotiated on behalf of the Company, (ii) Two Million Five Hundred Thousand Dollars ($2,500,000) from the Company for achievement during the Term of adoption of a new, multi-bundled payment system for freestanding radiation therapy centers, to which the Company elects not to participate , (iii) Two Million Five Hundred Thousand Dollars ($2,500,000) upon the Company's initial election to participate in any way in the system referred to in clause (ii) above, and (iv) other cash bonuses as agreed to in writing in the future between the Executive and the Chief Executive Officer with approval from the Compensation Committee.  Payments under clauses (i) through (iii) above shall be made annually over a five year period, with the first payment payable within five (5) business days following the freeze, adoption or election, respectively. Any deferred payments of incentive bonuses shall be immediately accelerated and paid in full in the event of (A) the Executive's termination without Cause, termination by the Executive for Good Reason or as a result of the Executive's death or Disability or (B) upon a "Change of Control" (as defined in the Third Amended and Restated Limited Liability Company Agreement of Radiation Therapy Investments, LLC dated and effective as of June 11, 2012, as may be subsequently amended), a "Sale of the Company," or a "Public Offering" (each as defined in the Amended and Restated

*[handwritten: Ti's TO HOPPS]*

2

Securityholders Agreement of Radiation Therapy Investments, LLC dated as of March 25, 2008, as may be subsequently amended).

4.    ADDITIONAL COMPENSATION AND BENEFITS.  The Executive shall receive the following additional compensation and welfare and fringe benefits:

(a)    Participation in Benefit Plans.  The Executive shall be eligible to participate in the employee benefit plans and programs maintained by the Company from time to time for its executives and their dependants, or for its employees generally, including without limitation any life, medical, dental, accidental and disability insurance and profit sharing, pension, retirement, savings, stock option, incentive stock and deferred compensation plans, in accordance with the terms and conditions as in effect from time to time.  Notwithstanding the foregoing, the Company may modify or terminate any employee benefit plan at any time.  The Company shall pay the medical insurance premiums for Executive and his dependants.

(b)    Vacation.  The Executive shall be entitled to no less than six weeks of vacation (or such greater vacation benefits as may be provided in the future by the Board or Compensation Committee) during each year during the Term and any extensions thereof, prorated for partial years, with any unused vacation during any year to accrue and carry-forward to the next year.

(c)    Business Expenses.  The Company shall reimburse the Executive, in accordance with the Company's expense reimbursement policy, for all reasonable expenses he incurs in promoting the Company's business, including expenses for travel, entertainment of business associates, service and usage charges for business use of cellular phones and similar items, upon presentation by the Executive from time to time of an itemized account of such expenditures.

(d)    Equity.  The Executive shall be entitled to the grants of equity interests in Radiation Therapy Investments, LLC ("RTS") as provided in the Letter Agreement dated as of the date hereof by and among the Executive, the Company and RTS.

(e)    Expenses of this Agreement.  The Company shall reimburse the Executive for all reasonable attorneys' fees incurred by Executive in connection with the negotiation of this Agreement up to a maximum of $15,000.

5.    PAYMENTS UPON TERMINATION.

(a)    Involuntary Termination.  If the Executive's employment is terminated by the Company during the Term, the Executive shall be entitled to receive his Base Salary and unreimbursed expenses accrued and unpaid through the date of termination (the "Termination Date").  The Executive shall also receive any nonforfeitable benefits already earned and payable to him under the terms of any deferred compensation, incentive or other benefit plan maintained by the Company, payable in accordance with the terms of the applicable plan.  The payments and benefits that the Executive shall be entitled to pursuant to this Section 5(a) are collectively referred to as the Executive's "Accrued Compensation."

(b)   Severance Payments.  If the Executive's employment is terminated (i) by the Company without Cause or (ii) by the Executive for Good Reason, then in addition to payment of the Accrued Compensation and any deferred payments of performance incentive bonuses pursuant to Section 3(b), the Company shall also be obligated to make a series of monthly payments to the Executive for a period of twenty-four (24) months immediately following the Termination Date so long as the Executive continues to comply with Sections 8 and 9 hereof; provided, that the payments that otherwise would have been made during the sixty (60) day period after the Termination Date shall be made on the first payroll period after the sixtieth (60th) day following the Termination Date and shall include payment of any amounts that would otherwise be due prior thereto.  Each monthly payment shall be equal to 1/24th of the Executive's annual Base Salary, as in effect on the Termination Date.  In addition to the foregoing, provided that the Executive elects for himself and his dependants continued welfare coverage pursuant to COBRA, the Company shall pay during the period the Executive actually continues such coverage, but in any event not to exceed 12 months, the same percentage of the monthly premium costs for COBRA continuation coverage as it pays of the monthly premium costs for medical coverage for senior executives and their dependants generally; provided that the Company may pay this amount by paying the Executive a monthly amount equal on an after-tax basis to such amount (the "Monthly Payments"); provided that to the extent that the Company determines that the Monthly Payments violate the requirements of Section 2716 of the Public Health Service Act, the Company may unilaterally eliminate or amend the Monthly Payments in its sole discretion.

(c)   Disability.  The Company shall be entitled to terminate this Agreement, if the Board determines that the Executive has been unable to attend to his duties for at least one-hundred and eighty (180) days because of a medically diagnosable physical or mental condition, and has received a written opinion from a physician acceptable to the Board that such condition prevents the Executive from resuming full performance of his duties at such time and during the succeeding one-hundred and eighty (180) days or is likely to continue for an indefinite period (any such condition, a "Disability").  If the Company terminates this Agreement due to Executive's Disability, the Executive shall be entitled to receive the Accrued Compensation, any deferred payments of performance incentive bonuses pursuant to Section 3(b) and any disability benefits payable pursuant to any long-term disability plan or other disability program or insurance policies that may be maintained or provided by the Company.

(d)   Termination for Cause.  If the Executive's employment is terminated by the Company for Cause, the amount the Executive shall be entitled to receive from the Company shall be limited to the Accrued Compensation.

For purposes of this Agreement, the term "Cause" shall be limited to (i) any action by the Executive involving willful disloyalty to the Company, such as embezzlement, fraud, misappropriation of corporate assets or a breach of the covenants set forth in Sections 8 and 9 below; (ii) the Executive being convicted of or entering a plea of guilty or no contest or similar plea with respect to, a felony; (iii) the Executive being convicted of or entering a plea of guilty or no contest or similar plea with respect to, any lesser crime or offense (x) committed in connection with the performance of his

4

duties hereunder, (y) involving fraud, dishonesty or moral turpitude or (z) that causes the Company or any of its subsidiaries a substantial and material financial detriment; (iv) neglect or misconduct in carrying out Executive's material duties (other than resulting from the Executive's Disability) or violations of policies of the Company and/or its subsidiaries resulting in harm to the Company or any of its subsidiaries; or (v) failure, refusal or inability (except where due to illness or Disability) to perform Executive's duties hereunder. Notwithstanding the foregoing, no termination pursuant to subsection (iv) or (v) shall be treated as termination for Cause unless the Board has provided the Executive with written notice specifying in reasonable detail the alleged Cause for termination and the Cause is not cured within 30 days after the date of such notice.

(e)     Voluntary Termination by the Executive.  If the Executive resigns or otherwise voluntarily terminates his employment and the termination is not for Good Reason, the Executive shall only be entitled to the Accrued Compensation upon such termination.

For purposes of this Agreement, a termination by the Executive shall be for "Good Reason" if the Executive resigns after the Executive is (i) assigned to a position other than Senior Vice President of the Company (other than any such assignment for Cause or by reason of Disability) without the Executive's consent, (ii) assigned duties materially inconsistent with such position (other than any such assignment for Cause or by reason of Disability) without the Executive's consent, and such assignment is not rectified within 15 business days after written notice to the Company, or (iii) the Executive is transferred to a geographic location of employment more than 50 miles from Washington, D.C. without the Executive's consent; provided that Good Reason shall not exist under this paragraph unless the Executive provides the Board with written notice specifying in reasonable detail the event constituting "Good Reason" within ninety (90) days of its occurrence and such breach is not cured within thirty (30) days after the date of such notice, and the Executive actually terminates his employment within 30 days following the expiration of such cure period.

(f)   .  Release.  In order to receive the severance payments and benefits hereunder (other than the Accrued Compensation), the Executive must execute and not revoke a general release of claims in favor of the Company substantially in the form attached hereto as Exhibit A.  To the extent that such release is not executed and delivered (and no longer subject to revocation, if applicable) within sixty (60) days following the Termination Date, the Executive shall forfeit all rights to any such severance payments and benefits.

6.     DEATH.  If the Executive dies during the Term, the Company shall pay to the Executive's estate a lump-sum payment equal to the sum of (i) the Executive's Accrued Compensation, plus (ii) any deferred payments of performance incentive bonuses pursuant to Section 3(b), plus (iii) the product of (x) the Board's good faith estimated annual bonus (not including any performance incentive bonuses pursuant to clauses (i) through (iii) of Section 3(b)) for the fiscal year during which the death occurs based on the performance of the Company at the time of death and (y) a fraction, the numerator of which is the number of whole and partial months in the fiscal year in which the death occurs through the date of death, and the

5

denominator of which is 12. In addition, the death benefits payable by reason of the Executive's death under any retirement, deferred compensation or other employee benefit plan maintained by the Company shall be paid to the beneficiary designated by the Executive in accordance with the terms of the applicable plan or plans.

7.  **WITHHOLDING.** The Company shall, to the extent permitted by law, have the right to withhold and deduct from any payment hereunder any federal, state or local taxes of any kind required by law to be withheld with respect to any such payment.

8.  **PROTECTION OF CONFIDENTIAL INFORMATION.** The Executive agrees that he will keep all confidential and proprietary information of the Company or relating to its business (including, but not limited to, information regarding the Company's customers, pricing policies, methods of operation, proprietary computer programs and trade secrets) confidential, and that he will not (except with the Company's prior written consent), while in the employ of the Company or at any time thereafter, disclose any such confidential information to any person, firm, corporation, association or other entity, other than in furtherance of his duties hereunder, and then only to those with a "need to know." The Executive shall not disclose or make use of any such confidential information for his own purposes or for the benefit of any person, firm, corporation, association or other entity (except the Company) under any circumstances during or at any time after the Term. The foregoing shall not apply to any information which is already in the public domain, or is generally disclosed by the Company or is otherwise in the public domain at the time of disclosure, except if such information is in the public domain as a result of the Executive's actions in contravention of this Section 8.

The Executive recognizes that because his work for the Company will bring him into contact with confidential and proprietary information of the Company, the restrictions of this Section 8 and 9 are required for the reasonable protection of the Company and its investments and for the Company's reliance on and confidence in the Executive.

9.  **PROHIBITION OF CERTAIN ACTIVITIES.** In consideration of the transactions contemplated hereby (including the grant of any equity pursuant to Section 4(d)), the Executive hereby covenants and agrees that he will not, for a period beginning on the date of this Agreement and ending twenty four (24) months after such Executive's Termination Date: (i) engage in any business activities for himself or on behalf of any enterprise in any capacity or own any interest in any entity which compete or are competitive with the Company in the business of organizing, establishing, developing, providing or managing radiation therapy services or services ancillary thereto, in any state in which the Company, its subsidiaries, Affiliates and/or any of its joint ventures then operate or has plans to operate as of the Executive's Termination Date, (ii) interfere or disrupt or attempt to interfere or disrupt, the relationships between the Company, its subsidiaries, Affiliates and/or joint ventures and any patient, referral source or supplier or other person having business relationships with the Company, its subsidiaries, affiliates and/or joint ventures, (iii) solicit, induce any employee, representative or agent of the Company or any of its subsidiaries or Affiliates to leave such employment or retention or to accept employment with or render services to or with any other person, firm, corporation or other entity unaffiliated with the Company or hire or retain any such employee, representative or agent, or take any action to materially assist or aid any other person, firm, corporation or other entity in identifying, hiring or soliciting any such employee,

representative or agent, or (iv) publish or make any disparaging statements about the Company, any Affiliate of the Company, or any of their directors, officers or employees, under circumstances where it is reasonably foreseeable that the statements will be made public (the activities described in clauses (i) through (iv) above, collectively, "Prohibited Activities"). Notwithstanding the foregoing, this Section 9 will be of no force and effect for the period (the "Toll Period") during which the Company fails to make the payments, if any, required under Section 5(b) and such payments are in fact due and payable pursuant to Section 5(b), provided that the Toll Period shall not take effect unless the Executive provides the Board with written notice that such payments are due and payable and the Company does not make such payments within thirty (30) days after the date of such notice. The Executive will be deemed to be engaged in Prohibited Activities if he engages or participates in any entity that engages in Prohibited Activities or becomes affiliated with any person who engages in Prohibited Activities as an employee, officer, director, consultant, agent, partner, proprietor or other participant; provided, that the ownership of no more than 2 percent of the stock of a publicly traded corporation shall not be deemed participation in or affiliation with an entity or person so long as the Executive has no other connection or relationship with such entity or person.

Notwithstanding anything to the contrary herein, the following shall not be deemed Prohibited Activities under clause (i) above:

(a)     Working for a hospital, healthcare system or healthcare provider; provided that and only for so long as (A) less than 10% of such hospital, health care system or healthcare provider's revenues relate to radiation therapy services, (B) such hospital, health care system or healthcare provider's (in addition to any other entity affiliated with such hospital or healthcare system) revenues related to the provision of radiation therapy services or services ancillary thereto, in the aggregate, do not exceed $20 million in any fiscal year and (C) such hospital, healthcare system or healthcare provider is not located within 50 miles of any then existing or planned Company radiation treatment center.

(b)     Continuing to provide services to a current client or new client of Liberty Partners substantially similar to the services such client or similar clients receive as of the date of this Agreement; provided that (A) in no circumstance shall such services involve the use or disclosure of any confidential information in violation of Section 8, and (B) such services are not reasonably expected to have an adverse impact on the Company or any of its Affiliates, as determined by the Board. Executive shall cooperate with the Board in determining whether Executive's services to Liberty Partners would be in violation of this Section 9.

For purposes of this Agreement, "Affiliate" shall mean, with respect to any Person (as defined below), any other Person directly or indirectly controlling, controlled by, or under common control with, such Person where "control" shall have the meaning given such term under Rule 405 of the Securities Act of 1933, as amended. For purposes of this Agreement, "Person" shall mean an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

eFiled Lee County Clerk of Courts Page 33

10.   INJUNCTIVE RELIEF.  The Executive acknowledges and agrees that it would be difficult to fully compensate the Company for damages resulting from the breach or threatened breach of the covenants set forth in Sections 8 and 9 of this Agreement and accordingly agrees that the Company shall be entitled to temporary and injunctive relief, including temporary restraining orders, preliminary injunctions and permanent injunctions, to enforce such provisions in any action or proceeding instituted in the United States District Court for the Western District of Florida or in any court in the State of Florida having subject matter jurisdiction.  This provision with respect to injunctive relief shall not, however, diminish the Company's right to claim and recover damages.

It is expressly understood and agreed that although the parties consider the restrictions contained in this Agreement to be reasonable, if a court determines that the time or territory or any other restriction contained in this Agreement is an unenforceable restriction on the activities of the Executive, no such provision of this Agreement shall be rendered void but shall be deemed amended to apply as to such maximum time and territory and to such extent as such court may judicially determine or indicate to be reasonable.

The Executive acknowledges and confirms that (a) the restrictive covenants contained in Sections 8 and 9 hereof are reasonably necessary to protect the legitimate business interests of the Company for substantial consideration, and (b) the restrictions contained in Sections 8 and 9 hereof (including without limitation the length of the term of the provisions of Sections 8 and 9 hereof) are not overbroad, overlong, or unfair and are not the result of overreaching, duress or coercion of any kind. The Executive further acknowledges and confirms that his full and faithful observance of each of the covenants contained in Sections 8 and 9 hereof will not cause him any undue hardship, financial or otherwise, and that enforcement of each of the covenants contained herein will not impair his ability to obtain employment commensurate with his abilities and on terms fully acceptable to him or otherwise to obtain income required for the comfortable support of him and his family and the satisfaction of the needs of his creditors.  The Executive acknowledges and confirms that his special knowledge of the business of the Company is such as would cause the Company serious injury or loss if he were to use such ability and knowledge to the benefit of a competitor or were to compete with the Company in violation of the terms of Sections 8 and 9 hereof. The Executive further acknowledges that the restrictions contained in Sections 8 and 9 hereof are intended to be, and shall be, for the benefit of and shall be enforceable by, the Company's successors and assigns.

If the Executive shall be in violation of any provision of Sections 8 and 9, then each time limitation set forth in the applicable section shall be extended for a period of time equal to the period of time during which such violation or violations occur.  If the Company seeks injunctive relief from such violation in any court, then the covenants set forth in Sections 8 and 9 shall be extended for a period of time equal to the pendency of such proceeding including all appeals by the Executive.

Sections 7 through 17 of this Agreement shall survive the termination or expiration of this Agreement.

11.   NOTICES.  All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given when personally delivered, sent by telecopy or facsimile

eFiled Lee County Clerk of Courts Page 34

(with confirmation of receipt), one day after deposit with a reputable overnight delivery service (charges prepaid) and three days after deposit in the U.S. Mail (postage prepaid and return receipt requested) to the address set forth below or such other address as the recipient party has previously delivered notice to the sending party.

        (a)    If to the Company:

Radiation Therapy Services, Inc.
c/o Vestar Capital Partners V, L.P.
245 Park Avenue, 41st Floor
New York, NY 10167
Attention: James L. Elrod, Jr.
Facsimile: (212) 808-4922

with copies (which shall not constitute notice) to:

Vestar Capital Partners V, L.P.
245 Park Avenue, 41st Floor
New York, NY 10167
Attention: General Partner
Facsimile: (212) 808-4922

Kirkland & Ellis LLP
Citigroup Center
601 Lexington Ave.
New York, NY 10022
Attention: Michael Movsovich
Facsimile: (212) 446-4900

        (b)    If to Executive, below Executive's signature, and if to Executive's legal representative, to such Person at the address of which the Company is notified in accordance with this Section 11, in each case with copies (which shall not constitute notice) to:

Mr. Andrew Woods
1050 K Street, NW Suite 315
Washington, DC 20001
Facsimile: (202) 638-0604

Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, NW
Washington, DC 20037
Attention: Jeffrey Grill
Facsimile: (202) 663-8007

12.    SEPARABILITY. If any provision of this Agreement shall be declared to be invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall not affect the remaining provisions hereof which shall remain in full force and effect.

9

Woods - AR Employment Agmt (FINAL).docx

13.    ASSIGNMENT.  This Agreement shall be binding upon and inure to the benefit of the heirs and representatives of the Executive and the assigns and successors of the Company, but neither this Agreement nor any rights hereunder shall be assignable or otherwise subject to hypothecation by the Executive.  The Company may assign this Agreement to any of its subsidiaries or Affiliates.

14.    ENTIRE AGREEMENT.  This Agreement represents the entire agreement of the parties and shall supersede any other previous contracts, arrangements or understandings between the Company and the Executive related to employment.  The Agreement may be amended at any time by mutual written agreement of the parties hereto.

15.    GOVERNING LAW.  This Agreement shall be construed, interpreted, and governed in accordance with the laws of the State of Florida, other than the conflict of laws provisions of such laws.

16.    SUBMISSION TO JURISDICTION.  Any suit, action or proceeding with respect to this Agreement, or any judgment entered by any court in respect of any thereof, shall be brought in any court of competent jurisdiction in the State of Florida, and each of the Company and the Executive hereby submit to the exclusive jurisdiction of such courts for the purpose of any such suit, action, proceeding or judgment.  The Executive and the Company hereby irrevocably each waive any objections which it may now or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement brought in any court of competent jurisdiction in the State of Florida, and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in any inconvenient forum.

17.    WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

18.    HEADINGS.  The headings contained in this Agreement are included for convenience only and no such heading shall in any way alter the meaning of any provision.

19.    WAIVER.  The failure of either party to insist upon strict adherence to any obligation of this Agreement shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.  Any waiver must be in writing.

20.    COUNTERPARTS.  This Agreement may be executed in two (2) counterparts, each of which shall be considered an original.

21.    SECTION 409A COMPLIANCE.

    (a)    The intent of the parties is that payments and benefits under this Agreement comply with Internal Revenue Code Section 409A and the regulations and guidance promulgated thereunder (collectively "Code Section 409A") and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance

10

therewith. To the extent that any provision hereof is modified in order to comply with Code Section 409A, such modification shall be made in good faith and shall, to the maximum extent reasonably possible, maintain the original intent and economic benefit to the parties hereto of the applicable provision without violating the provisions of Code Section 409A. In no event whatsoever shall the Company be liable for any additional tax, interest or penalty that may be imposed on the Executive by Code Section 409A or damages for failing to comply with Code Section 409A. It is intended that (i) each installment of the payments provided under this "Agreement" is a separate "payment" for purposes of Code Section 490A and (ii) that the payments satisfy, to the greatest extent possible, the exemptions from the application of Code Section 409A provided under Sections 1.409A-1(b)(4), 1.409A-1(b)(iii) and 1.409A-1(b)(v) of the Treasury Regulations.

(b)     A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Code Section 409A and Section 1.409A-1(h) of the Treasury Regulations and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service." If the Executive is deemed on the date of termination to be a "specified employee" within the meaning of that term under Code Section 409A(a)(2)(B) and Section 1.409A-1(i) of the Treasury Regulations, then with regard to any payment or the provision of any benefit that is considered deferred compensation under Code Section 409A payable on account of a "separation from service," such payment or benefit shall be made or provided at the date which is the earlier of (i) the expiration of the six (6)-month period measured from the date of such "separation from service" of the Executive, and (ii) the date of the Executive's death (the "Delay Period"). Upon the expiration of the Delay Period, all payments and benefits delayed pursuant to this Section (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to the Executive in a lump sum, and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein.

(c)     All expenses or other reimbursements under this Agreement shall be made on or prior to the last day of the taxable year following the taxable year in which such expenses were incurred by the Executive (provided that if any such reimbursements constitute taxable income to the Executive, such reimbursements shall be paid no later than March 15th of the calendar year following the calendar year in which the expenses to be reimbursed were incurred), and no such reimbursement or expenses eligible for reimbursement in any taxable year shall in any way affect the expenses eligible for reimbursement in any other taxable year, and the right to any reimbursement or expense may not be subject to liquidation or exchange for another benefit.

(d)     For purposes of Code Section 409A, the Executive's right to receive any installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments. Whenever a payment under this Agreement

11.

specifies a payment period with reference to a number of days, (e.g. "payment shall be made within thirty (30) days"), the actual date of payment within the specified period shall be within the sole discretion of the Company.

(e)     In no event shall any payment under this Agreement that constitutes "deferred compensation" for purposes of Code Section 409A be offset by any other payment pursuant to this Agreement or otherwise.

Woods - AR Employment Agmt (FINAL).docx

12

Execution Copy

IN WITNESS WHEREOF, this Agreement has been duly executed as of the day and year first above written.

RADIATION THERAPY SERVICES, INC.

By: _____

Name:  Daniel E. Doseretz, M.D.

Title:  President and Chief Executive Officer

EXECUTIVE:

_____

Andrew Woods

ADDRESS:

13241 Penderosa Way

Ft. Myers,  Florida   33908

*Signature Page to*
*Employment Agreement*

Woods - AR Employment Agmt (FINAL).docx

Execution Copy

EXHIBIT A

### Form of Release

THIS RELEASE (this "Release") is made as of this 23 rd day of May , 2013 by and between RADIATION THERAPY SERVICES, INC., a Florida corporation (the "Company"), and ANDREW WOODS ("Executive").

PRELIMINARY RECITALS

A.    Executive and the Company are parties to an Amended and Restated Executive Employment Agreement, dated as of May 13, 2013 (the "Agreement").

B.    Executive's employment with the Company has terminated.

AGREEMENT

In consideration of the payments due Executive under the Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Executive, intending to be legally bound, does hereby, on behalf of himself and his agents, representatives, attorneys, assigns, heirs, executors and administrators (collectively, the "Executive Parties") REMISE, RELEASE AND FOREVER DISCHARGE the Company, it's Affiliates (as defined in the Agreement), subsidiaries, parents, joint ventures, and its and their officers, directors, shareholders, members, and managers, and its and their respective successors and assigns, heirs, executors, and administrators (collectively, the "Company Parties") from all causes of action, suits, debts, claims and demands whatsoever in law or in equity, which Executive or any of the Executive Parties ever had, now has, or hereafter may have, by reason of any matter, cause or thing whatsoever, from the beginning of Executive's initial dealings with the Company to the date of this Release, and particularly, but without limitation of the foregoing general terms, any claims arising from or relating in any way to Executive's employment relationship with Company, the terms and conditions of that employment relationship, and the termination of that employment relationship, including, but not limited to, any claims arising under the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq. ("ADEA"), Title VII of The Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the Civil Rights Act of 1966, 42 U.S.C. §1981, the Civil Rights Act of 1991, Pub. L. No. 102-166, the Americans with Disabilities Act, 42 U.S.C. §12101 et seq., the Age Discrimination in Employment Act, as amended, 29 U.S.C. §621 et seq., the Fair Labor Standards Act, 29 U.S.C.§201 et seq., the National Labor Relations Act, 29 U.S.C. §151 et seq., the Civil False Claims Act, §31 U.S.C §3729 et seq and related state false claims act provisions and any other claims under any federal, state or local common law, statutory, or regulatory provision, now or hereafter recognized, but not including such claims to payments and other rights provided Executive under the Agreement. This Release is effective without regard to the legal nature of the claims raised and without regard to whether any such claims are based upon tort, equity, implied or express contract or discrimination of any sort. Except as specifically provided herein, it is expressly understood and agreed that this Release shall operate as a clear and unequivocal

waiver by Executive of any claim for accrued or unpaid wages, benefits or any other type of payment. Notwithstanding the foregoing, the Executive does not release, discharge or waive any rights to (1) payments and benefits provided under the his Agreement that are contingent upon the execution by Executive of this Release, (2) benefit claims under any employee benefit plans in which the Executive is a participant by virtue of his employment with the Company arising after the execution of this Release by Executive, (3) any rights the Executive may have as an equity holder of the Company or any Affiliate and (4) any rights Executive may have to be indemnified and/or advanced expenses under any corporate document of the Company, any agreement or pursuant to applicable law or to be covered under any applicable directors' and officers' liability insurance policies.

2.      Executive expressly waives all rights afforded by any statute which limits the effect of a release with respect to unknown claims. Executive understands the significance of his release of unknown claims and his waiver of statutory protection against a release of unknown claims.

3.      Executive agrees that he will not be entitled to or accept any benefit from any claim or proceeding within the scope of this Release that is filed or instigated by him or on his behalf with any agency, court or other government entity.

4.      Executive further agrees and recognizes that he has permanently and irrevocably severed his employment relationship with the Company, effective as of the date hereof, that he shall not seek employment with the Company or any affiliated entity at any time in the future, and that the Company has no obligation to employ him in the future.

5.      The parties agree and acknowledge that the Agreement, and the settlement and termination of any asserted or unasserted claims against the Company and the Company Parties pursuant to this Release, are not and shall not be construed to be an admission of any violation of any federal, state or local statute or regulation, or of any duty owed by the Company or any of the Company Parties to Executive.

6.      Executive certifies and acknowledges as follows:

(a)     That he has read the terms of this Release, and that he understands its terms and effects, including the fact that he has agreed to RELEASE AND FOREVER DISCHARGE the Company and all Company Parties from any legal action or other liability of any type related in any way to the matters released pursuant to this Release other than as provided in the Agreement and in this Release.

(b)     That he understands the significance of his release of unknown claims and his waiver of statutory protection against a release of unknown claims.

(c)     That he has signed this Release voluntarily and knowingly in exchange for the consideration described herein, which he acknowledges is adequate and satisfactory to him and which he acknowledges is in addition to any other benefits to which he is otherwise entitled.

Woods - AR Employment Agmt (FINAL).docx          A-2

(d)     That he has been and is hereby advised in writing to consult with an attorney prior to signing this Release.

(e)     That he does not waive rights or claims that may arise after the date this Release is executed or those claims arising under the Agreement with respect to payments and other rights due Executive on the date of, or during the period following, the termination of his Employment.

(f)     That the Company has provided him with adequate opportunity, including a period of [twenty-one (21)][forty-five] days from the initial receipt of this Release and all other time periods required by applicable law, within which to consider this Release (it being understood by Executive that Executive may execute this Release less than [twenty-one (21)][forty-five] days from its receipt from the Company, but agrees that such execution will represent his knowing waiver of such [21][45]-day consideration period), and he has been advised by the Company to consult with counsel in respect thereof.

(g)     That he has seven (7) calendar days after signing this Release within which to rescind, in a writing delivered to the Company, the portion of this Release related to claims arising under ADEA or any other claim arising under any other federal, state or local that requires extension of this revocation right as a condition to the valid release and waiver of such claim.

(h)     That at no time prior to or contemporaneous with his execution of this Release has he filed or caused or knowingly permitted the filing or maintenance, in any state, federal or foreign court, or before any local, state, federal or foreign administrative agency or other tribunal, any charge, claim or action of any kind, nature and character whatsoever ("Claim"), known or unknown, suspected or unsuspected, which he may now have or has ever had against the Company Parties which is based in whole or in part on any matter referred to in Section 1 above; and, subject to the Company's performance under this Release, to the maximum extent permitted by law, Executive is prohibited from filing or maintaining, or causing or knowingly permitting the filing or maintaining, of any such Claim in any such forum.  Executive hereby grants the Company his perpetual and irrevocable power of attorney with full right, power and authority to take all actions necessary to dismiss or discharge any such Claim.  Executive further covenants and agrees that he will not encourage any person or entity, including but not limited to any current or former employee, officer, director or stockholder of the Company, to institute any Claim against the Company Parties or any of them, and that except as expressly permitted by law or administrative policy or as required by legally enforceable order he will not aid or assist any such person or entity in prosecuting such Claim.

7.      The Company (meaning, solely for this purpose, the Company's directors and executive officers and other individuals authorized to make official communications on the Company's behalf) will not disparage Executive or Executive's performance or otherwise take any action which could reasonably be expected to adversely affect Executive's personal or professional reputation.  Similarly, Executive will not disparage any Company Party or otherwise

take any action which could reasonably be expected to adversely affect the personal or professional reputation of any Company Party.

8.      Executive agrees that he will not disparage or denigrate to any person any aspect of his relationship with the Company or any of its Affiliates or any Company Party, nor the character of the Company or any of its Affiliates or their respective agents, representatives, products, or operating methods, whether past, present, or future, and whether or not based on or with reference to their past relationship; provided, however, that this paragraph shall have no application to any evidence or testimony requested of Executive by any court or government agency. In the event any government agency or any of Company's or any of its Affiliates' present or future labor unions, adverse parties in actual or potential litigation, suppliers, service providers, employees or customers initiate communications with the Executive, the Executive agrees that he will only inform any such persons, consistent with this paragraph, of his change in status and direct such persons to an appropriate officer or current employee of the Company.

9.      Miscellaneous

(a)     This Release and the Agreement, and any other documents expressly referenced therein, constitute the complete and entire agreement and understanding of Executive and the Company with respect to the subject matter hereof, and supersedes in its entirety any and all prior understandings, commitments, obligations and/or agreements, whether written or oral, with respect thereto; it being understood and agreed that this Release and including the mutual covenants, agreements, acknowledgments and affirmations contained herein, is intended to constitute a complete settlement and resolution of all matters set forth in Section 1 hereof.

(b)     The Company Parties are intended third-party beneficiaries of this Release, and this Release may be enforced by each of them in accordance with the terms hereof in respect of the rights granted to such Company Parties hereunder. Except and to the extent set forth in the preceding two sentences, this Release is not intended for the benefit of any Person other than the parties hereto, and no such other person or entity shall be deemed to be a third party beneficiary hereof. Without limiting the generality of the foregoing, it is not the intention of the Company to establish any policy, procedure, course of dealing or plan of general application for the benefit of or otherwise in respect of any other employee, officer, director or stockholder, irrespective of any similarity between any contract, agreement, commitment or understanding between the Company and such other employee, officer, director or stockholder, on the one hand, and any contract, agreement, commitment or understanding between the Company and Executive, on the other hand, and irrespective of any similarity in facts or circumstances involving such other employee, officer, director or stockholder, on the one hand, and Executive, on the other hand.

(c)     The invalidity or unenforceability of any provision of this Release shall not affect the validity or enforceability of any other provision of this Release, which shall otherwise remain in full force and effect.

Woods - AR Employment Agmt (FINAL).docx            A-4

(d)     This Release may be executed in separate counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

(e)     The obligations of each of the Company and Executive hereunder shall be binding upon their respective successors and assigns. The rights of each of the Company and Executive and the rights of the Company Parties shall inure to the benefit of, and be enforceable by, any of the Company's, Executive's and the Company Parties' respective successors and assigns. The Company may assign all rights and obligations of this Release to any successor in interest to the assets of the Company.

(f)     No amendment to or waiver of this Release or any of its terms shall be binding upon any party hereto unless consented to in writing by such party.

(g)     **ALL ISSUES AND QUESTIONS CONCERNING THE CONSTRUCTION, VALIDITY, ENFORCEMENT AND INTERPRETATION OF THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF DELAWARE OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAW OF ANY JURISDICTION OTHER THAN THE STATE OF DELAWARE.**

\*   \*   \*   \*   \*

Woods - AR Employment Agmt (FINAL).docx          A-5

Intending to be legally bound hereby, Executive and the Company have executed this Release as of the date first written above.

[NAME]

By: _____

Name:

Title:

**SIGN & DATE**

## READ CAREFULLY BEFORE SIGNING

I have read this Release and have been given adequate opportunity, including [21][45] days from my initial receipt of this Release, to review this Release and to consult legal counsel prior to my signing of this Release. I understand that by executing this Release I will relinquish certain rights or demands I may have against the Company Parties or any of them.

_____

[Name]

Witness:

Woods - AR Employment Agmt (FINAL).docx          A-6

## AMENDMENT TO
## AMENDED AND RESTATED EXECUTIVE EMPLOYMENT AGREEMENT

This **AMENDMENT TO AMENDED AND RESTATED EXECUTIVE EMPLOYMENT AGREEMENT** ("Amendment") is effective as of this _12th_ day of _May_, 2015 ("Effective Date") by and between **RADIATION THERAPY SERVICES, INC. D/B/A 21ST CENTURY ONCOLOGY, A Florida Corporation** ("Company"), and **ANDREW WOODS** ("Executive").

### WITNESSETH:

**WHEREAS,** Company and Executive entered into an Amended and Restated Executive Employment Agreement dated May 13, 2013 (the "Agreement"); and

**WHEREAS,** Company and Executive desire to Amend the Agreement to include the duties Executive has been performing since its inception; and

**NOW, THEREFORE,** the parties hereby agree as follows:

1. **Section 1. Employment** The first paragraph is hereby deleted in its entirety and replaced with the following:

   1. EMPLOYMENT. The Company hereby agrees to employ the Executive upon the terms and conditions herein contained, and the Executive hereby agrees to accept such employment for the term described below. The Executive agrees to serve as the Company's Executive Vice President for Governmental Affairs during the Term (as defined below) and have the duties and responsibilities as may be reasonably assigned to him by the Chief Executive Officer or the board of directors of the Company (the "Board"), including providing legal consultation, advice and direction to the Chief Executive Officer, Board and leadership team. In such capacity, the Executive shall report to the Chief Executive Officer and shall have the authorities, functions, powers, duties and responsibilities that are customarily associated with such position and as the Chief Executive Officer or the Board may reasonably assign to him from time to time consistent with such positions.

   2. **Other Terms and Conditions.** All other terms and conditions of the Agreement not amended by virtue of this Amendment shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Amendment on the dates set forth below.

RADIATION THERAPY SERVICES, INC.:

By: _____

Its: _____
     Daniel Dosoretz, M.D.
          CEO

Date: _____5/20/15_____

EXECUTIVE:

By: _____

Date: _____5/12/15_____

2

# EXHIBIT B

**From:** Andrew Woods
**Sent:** Tuesday, September 27, 2016 6:12 PM
**To:** Kimberly Commins-Tzoumakas (kcommins@hallrender.com) <kcommins@hallrender.com>
**Cc:** 'Kreissl, Jill' <Jill.Kreissl@21co.com>
**Subject:** Andrew L. Woods Release
**Importance:** High

Dear Kim:

I have reviewed the Release I was provided after the Company terminated my employment last Friday, September 26, 2016. I have made just a few small changes, consistent with the Amended and Restated Executive Employment Agreement executed between me and the Company. If the Company agrees to these minor revisions, I will execute the Release right away.

Please confirm that once I have executed the Release, the Company will immediately begin to pay me the monthly severance payments. In addition, please let me know (1) whether the Company will be paying to the insurance provider the percentage of the monthly premium costs for COBRA continuation coverage that the Company has agreed to pay or whether the Company will be paying to me an equal monthly amount on an after-tax basis and (2) when the Company will begin to make those payments.

Finally, I would appreciate it if you or Jill would please provide to me the paperwork necessary for me to elect to continue coverage for myself and my dependents pursuant to COBRA.

Thank you very much.

Andrew

Andrew L. Woods
Liberty Partners Group
1425 K Street, NW
Suite 650
Washington, D.C. 20005
(202) 827-6488 phone
awoods@libertypartnersgroup.com

### Release

THIS RELEASE (this "Release") is made as of this ___ day of _____, 2016, by and between 21ST CENTURY ONCOLOGY, INC., f/k/a RADIATION THERAPY SERVICES, INC., a Florida corporation (the "Company"), and ANDREW WOODS ("Executive").

## PRELIMINARY RECITALS

A.     Executive and the company are parties to an Amended and Restated Executive Employment Agreement, dated as of May 13, 2013 (the "Agreement").

B.     Executive's employment with the Company has terminated.

## AGREEMENT

In consideration of the severance payments payments-due Executive under Section 5(b) of the Agreement, which include twenty four (24) monthly payments equal to 1/24th of the Executive's annual Base Salary and payments for twelve (12) months of the same percentage of the monthly premium costs for COBRA continuation coverage that the Company pays of the monthly premium costs for medical coverage for senior executives and their dependents, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     Executive, intending to be legally bound, does hereby, on behalf of himself and his agents, representatives, attorneys, assigns, heirs, executors and administrators (collectively, the "Executive Parties") REMISE, RELEASE AND FOREVER DISCHARGE the Company, its affiliates, (as defined in the Agreement) subsidiaries, parents, joint ventures, and its and their officers, directors, shareholders, members, and managers, and its and their respective successors and assigns, heirs, executors, and administrators (collectively, the "Company Parties") from all causes of action, suits, debts, claims and demands whatsoever in law or in equity, which Executive or any of the Executive Parties ever had, now has, or hereafter may have, by reason of any matter, cause or thing whatsoever, from the beginning of Executive's initial dealings with the Company to the date of this Release, and particularly, but without limitation of the foregoing general terms, any claims arising from or relating in any way to Executive's employment relationship with Company, the terms and conditions of that employment relationship, and the termination of that employment relationship, including, but not limited to, any claims arising under the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq. ("ADEA"), Title VII of The Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the Civil Rights Act of 1966, 42 U.S.C. §1981, the Civil Rights Act of 1991, Pub. L. No. 102-166, the Americans with Disabilities Act, 42 U.S.C. §12101 et seq., the Age Discrimination in Employment Act, as amended, 29 U.S.C. §621 et seq., the Fair Labor Standards Act, 29 U.S.C. §201 et seq., the National Labor Relations Act, 29 U.S.C. §151 et seq., the Civil False Claims Act, §31 U.S.C. §3729 et seq and related state false claims act provisions and any other claims under any federal, state or local common law, statutory, or regulatory provision, now or hereafter recognized, but not including such claims to payments and other rights provided Executive under the Agreement. This Release is effective without regard to the legal nature of the claims raised

and without regard to whether any such claims are based upon tort, equity, implied or express contract or discrimination of any sort. Except as specifically provided herein, it is expressly understood and agreed that this Release shall operate as a clear and unequivocal waiver by Executive of any claim for accrued or unpaid wages, benefits, any other type of payment. Notwithstanding the foregoing, the Executive does not release, discharge or waive any rights to (1) payments and benefits provided under this Agreement that are contingent upon the execution by Executive of this Release, (2) payment of incentive bonuses owed to the Executive under Section 3(b) of the Agreement, (3) benefit claims under any employee benefit plans in which the Executive is a participant by virtue of his employment with the Company arising after the execution of this Release by Executive, (34) any rights the Executive may have as an equity holder of the Company or any Affiliate and (45) any rights Executive may have to be indemnified and/or advanced expenses under any corporate document of the Company, any agreement or pursuant to applicable law or to be covered under any applicable directors' and officers' liability insurance policies.

2.      Executive expressly waives all rights afforded by any statute which limits the effect of a release with respect to unknown claims. Executive understands the significance of his release of unknown claims and his waiver of statutory protection against a release of unknown claims

3.      Executive agrees that he will not be entitled to or accept any benefit from any claim or proceeding within the scope of this Release that is filed or instigated by him or on his behalf with any agency, court or other government entity.

4.      Executive further agrees and recognizes that he has permanently and irrevocably severed his employment relationship with the Company, effective as of the date hereof, that he shall not seek employment with the Company or any affiliated entity at any time in the future, and that the Company has no obligation to employ him in the future.

5.      The parties agree and acknowledge that the Agreement, and the settlement and termination of any asserted or unasserted claims against the Company and the Company Parties pursuant to this Release, are not and shall not be construed to be an admission of any violation of any federal, state or local statute or regulation, or of any duty owed by the Company or any of the Company Parties to Executive.

6.      Executive certifies and acknowledges as follows:

(a)     That he has read the terms of this Release, and that he understands its terms and effects, including the fact that he has agreed to RELEASE AND FOREVER DISCHARGE the Company and all Company Parties from any legal action or other liability of any type related in any way to the matters released pursuant to this Release other than as provided in the Agreement and in this Release.

(b)     That he understands the significance of his release of unknown claims and his waiver of statutory protection against a release of unknown claims.

(c)     That he has signed this Release voluntarily and knowingly in exchange for the consideration described herein, which he acknowledges is adequate and satisfactory

to him and which he acknowledges is in addition to any other benefits to which he is otherwise entitled.

(d)     That he has been and is hereby advised in writing to consult with an attorney prior to signing this Release.

(e)     That he does not waive rights or claims that may arise after the date this Release is executed or those claims arising under the Agreement with respect to payments and other rights due Executive on the date of, or during the period following, the termination of his Employment.

(f)     That the Company has provided him with adequate opportunity, including a period of twenty-one (21) days from the initial receipt of this Release and all other time periods required by applicable law, within which to consider this Release (it being understood by Executive that Executive may execute this Release less than twenty-one (21) days from its receipt from the Company, but agrees that such execution will represent his knowing waiver of such 21-day consideration period), and he has been advised by the Company to consult with counsel in respect thereof.

(g)     That he has seven (7) calendar days after signing this Release within which to rescind, in a writing, delivered to the Company, the portion of this Release related to claims arising under ADEA or any other claim arising under any other federal, state or local that requires extension of this revocation right as a condition to the valid release and waiver of such claim.

(h)     That at no time prior to or contemporaneous with his execution of this Release has he filed or caused or knowingly permitted the filing or maintenance, in any state, federal or foreign court, or before any local, state, federal or foreign administrative agency or other tribunal, any charge, claim or action of any kind, nature and character whatsoever ("Claim"), known or unknown, suspected or unsuspected, which he may now have or has ever had against the Company Parties which is based in whole or in part on any matter referred to in Section 1 above; and, subject to the Company's performance under this Release, to the maximum extent permitted by law, Executive is prohibited from filing or maintaining, or causing or knowingly permitting the filing or maintaining, of any such Claim in any such forum. Executive hereby grants the Company his perpetual and irrevocable power of attorney with full right, power and authority to take all actions necessary to dismiss or discharge any such Claim. Executive further covenants and agrees that he will not encourage any person or entity, including but not limited to any current or former employee, office, director or stockholder of the Company, to institute any claim against the Company Parties or any of them, and that except as expressly permitted by law or administrative policy or as required by legally enforceable order he will not aid or assist any such person or entity in prosecuting such Claim.

7.     The Company (meaning, solely for this purpose, the Company's directors and executive officers and other individuals authorized to make official communications on the Company's behalf) will not disparage Executive or Executive's performance or otherwise take any action which could reasonably be expected to adversely affect Executive's personal or

professional reputation. Similarly, Executive will not disparage any Company Party or otherwise take any action which could reasonably be expected to adversely affect the personal or professional reputation of any Company Party.

8.      Executive agrees that he will not disparage or denigrate to any person any aspect of his relationship with the Company or any of its Affiliates or any Company Party, nor the character of the Company or any of its Affiliates or their respective agents, representatives, products, or operating methods, whether past, present, or future, and whether or not based on or with reference to their past relationship; provided, however, that this paragraph shall have no application to any evidence or testimony requested of Executive by any court or government agency. In the event any government agency or any of Company's or any of its Affiliates' present or future labor unions, adverse parties in actual or potential litigation, suppliers, service providers, employees or customers initiate communications with the Executive, the Executive agrees that he will only inform any such persons, consistent with this paragraph, of his change in status and direct such persons to an appropriate officer or current employee of the Company.

9.      Miscellaneous

(a)      This Release and the Agreement, and any other documents expressly referenced therein, constitute the complete and entire agreement and understanding of Executive and the Company with respect to the subject matter hereof, and supersedes in its entirety any and all prior understandings, commitments, obligations and/or agreements, whether written or oral, with respect thereto; it being understood and agreed that this Release and including the mutual covenants, agreements, acknowledgments and affirmations contained herein, is intended to constitute a complete settlement and resolution of all matters set forth in Section 1 hereof.

(b)      The Company Parties are intended third-party beneficiaries of this Release, and this Release may be enforced by each of them in accordance with the terms hereof in respect of the rights granted to such Company Parties hereunder. Except and to the extent set forth in the preceding two sentences, this Release is not intended for the benefit of any Person other than the parties hereto, and no such other person or entity shall be deemed to be a third party beneficiary hereof. Without limiting the generality of the foregoing, it is not the intention of the Company to establish any policy, procedure, course of dealing or plan of general application for the benefit of or otherwise in respect of any other employee, officer, director or stockholder, irrespective of any similarity between any contract, agreement, commitment or understanding between the Company and such other employee, officer, director or stockholder, on the one hand, and any contract, agreement, commitment or understanding between the Company and Executive, the other hand, and irrespective of any similarity in facts or circumstances involving such other employee, officer, director or stockholder, on the one hand, and Executive, on the other hand.

(c)      The invalidity or unenforceability of any provision of this Release shall not affect the validity or enforceability of any other provision of this Release, which shall otherwise remain in full force and effect.

(d)     This Release may be executed in separate counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

(e)     The obligations of each of the Company and Executive hereunder shall be binding upon their respective successors and assigns. The rights of each of the Company and Executive and the rights of the Company Parties shall inure to the benefit of, and be enforceable by, any of the Company's, Executive's and the Company Parties' respective successors and assigns. The Company may assign all rights and obligations of this Release to any successor in interest to the assets of the Company.

(f)     No amendment to or waiver of this Release or any of its terms shall be binding upon any party hereto unless consented to in writing by such party.

(g)     **ALL ISSUES AND QUESTIONS CONCERNING THE CONSTRUCTION, VALIDITY, ENFORCEMENT AND INTERPRETATION OF THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF DELAWARE, OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAW OF ANY JURISDICTION OTHER THAN THE STATE OF DELAWARE.**

\* \* \* \* \*

Intending to be legally bound hereby, Executive and the Company have executed this Release as of the date first written above.

By: _____
             Andrew Woods

By: _____
             Name:

             Title: _____
             21st Century Oncology, Inc.


## READ CAREFULLY BEFORE SIGNING


I have read this Release and have been given adequate opportunity, including 21 days from my initial receipt of this Release, to review this Release and to consult legal counsel prior to my signing this Release. I understand that by executing this Release I will relinquish certain rights or demands I may have against the Company Parties or any of them.


_____
Andrew Woods


Witness:


_____

# EXHIBIT C

**From:** Andrew Woods
**Sent:** Tuesday, September 27, 2016 7:19 PM
**To:** Kimberly Commins-Tzoumakas (kcommins@hallrender.com) <kcommins@hallrender.com>
**Cc:** 'Kreissl, Jill' <Jill.Kreissl@21co.com>
**Subject:** Payment of Incentive Bonuses to Andrew L. Woods
**Importance:** High

Dear Kim,

Pursuant to Bill Spalding's instructions, I am sending you the attached letter requesting payment for incentive bonuses earned during my employment with 21st Century Oncology.

Thank you for your assistance.

Best,

Andrew

Andrew L. Woods
Liberty Partners Group
1425 K Street, NW
Suite 650
Washington, D.C. 20005
(202) 827-6488 phone
awoods@libertypartnersgroup.com

# Andrew L. Woods

<u>**Via Email**</u>

September 27, 2016

Kimberly Commins-Tzoumakas, Esq.
General Counsel
21st Century Oncology
2270 Colonial Boulevard
Fort Myers, Florida 33907

     Re:    **Payment of Incentive Bonuses**

Dear Ms. Commins-Tzoumakas:

    I am writing regarding the incentive bonuses that are immediately due and payable to me in light of the termination of my employment, without cause, on Friday, September 23, 2016.

    Section 3(b) of the Amended and Restated Executive Employment Agreement executed between me and the Company (the "Agreement") provides:

    <u>Performance Incentive and Other Bonuses</u>.  The Executive shall be entitled to receive the following incentive bonuses: (i) Five Million Dollars ($5,000,000) from the Company for achievement during the Term of a freeze on reductions in Medicare reimbursement to freestanding radiation therapy centers except for those reductions negotiated on behalf of the Company; (ii) Two Million Five Hundred Thousand Dollars ($2,500,000) from the Company for achievement during the Term of adoption of a new, multi-bundled payment system for freestanding radiation therapy centers, to which the Company elects not to participate, (iii) Two Million Five Hundred Thousand Dollars ($2,500,000) upon the Company's initial election to participate in any way in the system referred to in clause (ii) above . . . Payments under clauses (i) through (iii) above shall be made annually over a five year period, with the first payment payable within five (5) business days following the freeze, adoption or election, respectively.  <u>Any deferred payments of incentive bonuses shall be immediately accelerated and paid in full in the event of (A) the Executive's termination without Cause</u> . . . (emphasis added).

    The Company has already paid to me One Million Dollars ($1,000,000) for achievement of a freeze pursuant to Section 3(b)(i).  I expect the Company to pay to me as soon as practicable the remaining Four Million Dollars ($4,000,000).

11600 Court of Palms #704
Fort Myers, Florida 33908
(443) 253-4662
awoods@libertypartnersgroup.com

Kimberly Commins-Tzoumakas, Esq.
General Counsel, 21st Century Oncology
September 27, 2016
Page 2 of 2

I also expect the Company to pay to me as soon as practicable Two Million Five Hundred Thousand Dollars ($2,500,000), pursuant to Section 3(b)(ii), based upon the achievement of the adoption of a new, multi-bundled payment system for freestanding radiation therapy centers, and Two Million Five Hundred Thousand Dollars ($2,500,000), pursuant to Section 3(b)(iii), based upon the Company's election to participate in this multi-bundled payment system.

By way of background, on June 29, 2016, the Center for Medicare & Medicaid Innovation at the Centers for Medicare & Medicaid Services announced that it had selected nearly 200 physician group practices to participate in the Oncology Care Model ("OCM"), a multi-bundled payment system for freestanding radiation therapy centers that CMS implemented on July 1. The Company elected to participate in this new multi-bundled payment system when it applied for an OCM in July, 2015.

Please let me know when I can expect payment of the remaining $4 million bonus for the freeze and the $5 million bonus for the implementation of the new multi-bundled payment system in which the Company elected to participate. Please also let me know if there is additional information you would like for me to provide.

Thank you for your assistance.

Very truly yours,

Andrew L. Woods

cc: Ms. Jill Kreissl

11600 Court of Palms #704
Fort Myers, Florida 33908
(443) 253-4662
awoods@libertypartnersgroup.com

# EXHIBIT D

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

601 Lexington Avenue
New York, New York 10022

Matthew Solum
To Call Writer Directly:
(212) 446-4688
matthew.solum@kirkland.com

(212) 446-4800

www.kirkland.com

Facsimile:
(212) 446-4900

October 14, 2016

**BY E-MAIL and FEDERAL EXPRESS**

Andrew L. Woods
Partner
Liberty Partners Group
11600 Court of Palms # 704
Fort Myers, Florida 33908
(442) 253-4662

Re:     Amended and Restated Executive Employment Agreement (the
        "Contract") executed between you and Radiation Therapy Services, Inc.
        d/b/a 21st Century Oncology (the "Company")

Dear Mr. Woods:

I write regarding your September 27, 2016 letter requesting incentive bonuses you claim are due to be paid to you in light of the termination of your employment on September 23, 2016. We disagree with your assessment and will not be fulfilling your request.

As you state in your letter, Section 3(b) of the Contract contains certain provisions regarding incentive bonuses to be paid to you if certain conditions are met. Your letter also emphasizes the final clause of Section 3(b), which states that "Any deferred payments of incentive bonuses shall be immediately accelerated and paid in full in the event of (A) the Executive's termination without Cause..."

While this is an accurate recital of certain words in a portion of Section 3(b) of the Contract, that section does not exist in a vacuum, and there are several other provisions of the Contract relevant to these payment terms and your claim of entitlement to bonuses. Indeed, Section 1(ii), entitled "Employment," states, in part, that while you may "continue to own a majority interest in and provide services to Liberty Partners Group, LLC and their clients," you may do so only "so long as such activities do not materially interfere with [your] performance under this Agreement and would not otherwise violate any provision of Sections 8 or 9 of this Agreement." Section 9(i), in turn, requires that *for the term of the Contract and 24 months after your Termination Date*, you shall not "engage in any business activities for [your]self or on behalf of any enterprise in any capacity ... which compete[s] or [is] competitive with the

Beijing   Chicago   Hong Kong   Houston   London   Los Angeles   Munich   Palo Alto   San Francisco   Shanghai   Washington, D.C.

## KIRKLAND & ELLIS LLP

Andrew L. Woods
October 14, 2016
Page 2

Company in the business of organizing, establishing, developing, providing or managing radiation therapy services or services ancillary thereto, in any state in which the Company, its subsidiaries, Affiliates and/or any of its joint ventures then operate or has plans to operate as of [your] Termination Date."

It has recently come to the Company's attention that you have been violating Section 9 of the Contract. The Company has obtained several records demonstrating that you have done and continue to do lobbying work on behalf of at least one of the Company's key competitors—an entity that specializes in the provision and management of radiation therapy services in states in which the Company operates. According to the Lobbying Disclosure Act Database, for example, throughout the year 2016 alone, Moffitt Cancer Center was your client. This entity directly competes with the Company, as it provides and manages radiation therapy and services related to cancer treatment. Because you have breached the Contract, the Company is under no obligation to pay any incentive payments under Section 3(b), and you are similarly not entitled to any severance payments under Section 5(b).

Moreover, even if you had not breached the Contract and your commitments to the Company—which you plainly did—you incorrectly conclude that two of the key conditions precedent required to trigger two $2.5 million payments to you have been met. The two payments under Sections 3(ii) and 3(iii), respectively, are only to be paid upon "the Term of adoption of a new, multi-bundled payment system for freestanding radiation therapy centers, to which the Company elects not to participate" and "upon the Company's initial election to participate in any way in the system referred to in clause (ii)," respectively.

You claim that these prerequisites have been met because the Center for Medicare & Medicaid Innovation ("CMMI") adopted the Oncology Care Model ("OCM"), which, according to CMMI, "aims to provide higher quality, more highly coordinated oncology care at the same or lower cost to Medicare" by having physician practices enter "into payment arrangements that include financial and performance accountability for episodes of care surrounding chemotherapy administration to cancer patients." The OCM, however, is not a multi-bundled payment system for freestanding radiation systems. Accordingly, no payment is due to you for that reason as well.[1]

---

[1] It is telling that you did not even claim that these bonuses were owed to you until after you were terminated. If that program was a trigger under your Contract—and it was plainly not—then the initial portion of the bonus payment would have been due within five business days of the effective date of that program, which was July 1, 2016. You, however, made no claim to any such payment on the fifth business day, which was July 11, 2016, or at any time during your employment with the Company. Instead, you waited until after you were terminated—more than two months after the payment was supposedly due—to first claim that the OCM triggered the bonuses in your Contract.

# KIRKLAND & ELLIS LLP

Andrew L. Woods
October 14, 2016
Page 3

The Company has ensured that you have been compensated in accordance with the Contract by the complete payment of your Base Salary through the date of termination, *i.e.* September 23, 2016 (the "Termination Date"), and that you have been reimbursed for all expenses accrued through the Termination Date. As such, the Company has fully compensated you per the terms of the Contract.

The Company reserves all rights.

Regards,

Matthew Solum

cc:      Kimberly Commins-Tzoumakas, Esq.

Kate Coverdale

Andrew Barton

# EXHIBIT E

Letter Agreement

May 13, 2013

Mr. Andrew Woods
1050 K Street, NW Suite 315
Washington, DC 20001

RE:     Revised Compensation Arrangement

Dear Mr. Woods:

In consideration of your services on behalf of Radiation Therapy Services, Inc. d/b/a 21st Oncology, a Florida corporation ("RTS"), RTS and Radiation Therapy Investments, ] "Company") hereby agree as follows:

1.  **Amended and Restated Employment Agreement.** Your existing Employment Agreement with RTS dated May 11, 2011 (the "2011 Employment Agreement") is hereby amended and restated pursuant to the Amended and Restated Employment Agreement dated as of the date hereof and attached hereto.

2.  **Prior Equity Grant.** Pursuant to the 2011 Agreement, you were entitled to receive a grant of Class B and Class C Units of the Company representing approximately 1.0% of the residual equity of the Company. Sixty percent (60%) of the number of Units granted were to be Class B Units and forty percent (40%) of the number of Units granted were to be Class C Units. The intention was that (i) the Class B Units will be unvested at grant and vest in equal, annual pro-rata installments on each of the first five anniversaries following the date of grant provided that you remain continuously employed by RTS through each such vesting date, and (ii) the Class C Units will be unvested at grant and vest annually between 2012 and 2016 based upon the achievement of performance objectives as agreed to between you and the Chief Executive Officer of RTS, subject to the approval of the Compensation Committee of RTS.

    To the extent that the grant referred to in the 2011 Agreement was not made, such grant shall be made as soon as practicable. The terms of such grant shall be modified to provide that 40% of such Units shall be deemed vested and the remaining 60% shall vest in equal, annual pro-rata installments on each of the first three anniversaries following May 11, 2013. The Units shall vest immediately in the event your employment is terminated (i) by RTS without Cause, (ii) by you for Good Reason or (iii) upon your Death or Disability, as such terms are defined in the Amended and Restated Employment Agreement. You shall also have the right to put the Units to the Company at Fair Market Value (as defined in the Third Amended and Restated Limited Liability Company Agreement of RTS dated and effective as of June 11,

Andrew Woods
May 13, 2013
Page 2

2012 (as may be amended, the "Company Operating Agreement")) in the event your employment is terminated without Cause or you resign for Good Reason.

3.   **New Equity Grant.** The Company shall amend the Company Operating Agreement to provide for, and to issue to you, a profits interest (within the meaning of IRS Revenue Procedure 93-27 and any successor authority) in the Company (the "Interest"), which shall entitle you to receive upon a distribution under the Company Operating Agreement of the proceeds of a Company Sale (as defined in the Company Operating Agreement, a distribution equal to the product of (A) the difference between (i) the total aggregate amount being distributed at the time of such Company Sale distribution and all previous distributions from the date the Interest is issued (the "Grant Date"), minus (ii) the Fair Market Value of the Company as of the Grant Date (the "Grant Date Value") (but not less than zero), multiplied by (B) the fraction whose numerator is (i) $5.0 million and whose denominator is (ii) the difference between $525.0 million minus the Grant Date Value; provided that in the event of a Public Offering (as defined in the Company Operating Agreement), such Interest shall be equitably converted into the right to receive at the time of such Public Offering shares of Common Stock (as defined in the Company Operating Agreement) in the Company (or its successor) having a Fair Market Value equal to the amount determined pursuant to the formula above, substituting the following for clause (A): "the difference between (i) the Fair Market Value of the Company as of the date of the Public Offering minus (ii) the Grant Date Value (but not less than zero)". Any Common Stock issued pursuant to the preceding sentence shall be subject to ratable vesting on an annual basis for the five year period following the consummation of the Public Offering, conditioned on continuous employment with the Company (or its successor), provided that all such shares of Common Stock shall vest immediately in the event your employment is terminated (i) by RTS without Cause, (ii) by you for Good Reason or (ii) upon your Death or Disability, as such terms are defined in the Amended and Restated Employment Agreement.

*[Signatures appear on following page.]*

Andrew Woods
May 13, 2013
Page 9

Please confirm that the terms set forth in this Letter Agreement are acceptable to you by signing and returning to me an executed original of this Letter Agreement.

Very truly yours,

RADIATION THERAPY SERVICES, INC.

By: _____
Name:  Daniel E. Dosoretz, M.D.
Title:  President and Chief Executive Officer

Date: _____


RADIATION THERAPY INVESTMENTS, LLC

By: _____
Name:  Robert L. Rosner
Title:  Manager

Date: _____



ACCEPTED AND AGREED:

ANDREW WOODS

Date: _____May 23, 2013_____